## SALA v. COMMISSIONER OF INTERNAL REVENUE.

### No. 7.

Circuit Court of Appeals, Second Circuit.

Dec. 18, 1944.

Richard J. Cronan and M. Robert Gallop, both of New York City (George Trosk, of New York City, of counsel), for petitioner.

Morton K. Rothschild, of Washington, D. C., Samuel O. Clark, Jr., Asst. Atty. Gen., and Sewall Key, Sp. Asst. to Atty. Gen., for respondent.

Before L. HAND, AUGUSTUS N. HAND, and. CHASE, Circuit Judges.

L. HAND, Circuit Judge.

This appeal is from an order of the Tax Court, assessing against the petitioner a deficiency in income tax for the year 1935. For a number of years she had been the sole shareholder in two companies, each owning a large building in the City of New York: One called the Broadex Realty Corporation, and the other Ideal Investing, Inc. Until 1928, her husband was president of both these companies, and managed their business; and she had no part in that management. In that year he died, insolvent, and in order to pay his debts she applied in 1930 to her uncle, one Bache, a banker, for a loan. He agreed to arrange one for her from a bank, if she would put the control of all her affairs in his hands. She assented, and he got the loan, which his firm guaranteed—Bache himself receiving the shares of the two companies as security. Bache then entrusted the general financial conduct of the companies to his lawyer, Nathan, who prepared the resolutions, which we shall mention; but Bache himself had charge of the actual management of the buildings. The two together selected and elected all the officers of the companies.

Between 1927 and 1932, the petitioner had borrowed from the Broadex Company about $760,000, and nearly $1,250,000 from the Ideal Company—$2,000,000 in all—these loans being carried on the companies' books as accounts receivable. On January 15, 1935, Nathan had the directors of the Broadex Company pass a resolution, "that the account receivable of this corporation against Countess Sala be carried in the balance sheet at not exceeding $260,422.62, and that the residue shall be presently written off as uncollectable, but no claim of a deductible loss for income or other tax purposes shall be made by reason thereof." On December 24th of the same year, Nathan had the directors of the Ideal Company pass a resolution in substantially the same terms, except that the amount was $543,787.18. Following these resolutions

the accounts receivable against the taxpayer was carried at $500,000 on the books of the Broadex Company, and at $700,000 on those of the Ideal Company. The taxpayer never had any part personally in these "write-downs"; and the testimony showed that they were made to avoid carrying the accounts at what was thought to be a false value, thus giving possible color to the assessment against the companies of penalty taxes for their failure to declare dividends.

In April, 1938, Nathan had the directors of both companies adopt a resolution that the account be "written off as of December 31, 1937, as presently uncollectable, and be eliminated from the balance sheet," but that this should not "constitute the forgiveness" of the debtor, or "impair" the companies' rights. On the other hand, on October 13th of the same year, Nathan had resolutions passed rescinding the earlier resolutions of that year, and restoring the accounts against the taxpayer, in full, "regardless of the judgment of this Board" as to their "collectability." Upon this state of facts the Commissioner declared that the "write-downs" of 1935 made available to the taxpayer dividends to the extent of the earnings of the two companies in that year, and taxed her accordingly. The Tax Court affirmed this ruling, and she appealed.

The question is whether by the resolutions of 1935 the corporations released the taxpayer's debts in the amount of $1,200,-000. Three circuits[1] have held that, if they did, taxable income resulted, so far as the release made available to the taxpayer a distribution of profits. We can see no reason to disagree when the debt has really been released, though we do find it somewhat hard to understand how a mere resolution, passed without consideration from the shareholder, can have that effect, unless the debt is in the form of a note which the corporation delivers to the maker for cancellation.[2] Except in that case, we cannot believe that if, for example, the corporation later went bankrupt, the creditors would be barred from collecting the debt from the shareholder. Nor can the doctrine rest upon Higgins v. Smith, 308 U.S. 473, 60 S.Ct. 355, 84 L.Ed. 406, which held that when a sole shareholder deals with his corporation, the Treasury may at its pleasure disregard the form, or insist upon it. Certainly it has never been held that, when it does insist, the transaction will have other legal consequences than the law would attach to it, if it had been between the taxpayer and a stranger. However, in the view we take we need not say whether we should feel bound to follow those decisions which have so treated such resolutions; we wish merely to reserve the point.

We agree with the Tax Court that Nathan was the taxpayer's agent; and that it made no difference that he was also acting for Bache, as pledgee. She had given him entire authority, and she must be held to what he did on her behalf. The difficulty which we find is that the resolutions were not operative legal acts at all, and in no sense purported to release the debts, but merely declared the fact that they were in part uncollectable and should be "written off," so far as they were. We are quite unable to perceive on what possible theory such a declaration can be treated as a release, though it must be owned that the Sixth Circuit by a divided court came very near to so deciding in Hudson v. Commissioner, supra, 99 F.2d 630. Nor is the Commissioner's case any better if we look to the testimony, for it then appears that Nathan took the matter up with the directors, and that the whole purpose of the entries and of the resolutions was to avoid the false appearance of a larger surplus than existed, a surplus which might impose heavy penalties on the corporations for failure to declare dividends.

The Tax Court apparently came to its conclusion largely because the taxpayer had never returned any part of the borrowed proceeds as dividends in the years she withdrew them; and because it feared that to countenance such devices might prove a ready mask for fraud. The first reason is clearly not sound; for, if the borrowings were not what they appeared, but dividends in disguise, there were in fact no debts to release in 1935, and no income could possibly be taxed in that year. So far as concerns the facility for fraud which the taxpayer's success may provide, it is certainly not tolerable in any system of law to take

---

[1] Cohen v. Commissioner of Internal Revenue, 6 Cir., 77 F.2d 184; Wiese v. Commissioner of Internal Revenue, 8 Cir., 93 F.2d 921; Hudson v. Commissioner of Internal Revenue, 6 Cir., 99 F.2d 630; Allen v. Commissioner of Internal Revenue, 1 Cir., 117 F.2d 364.

[2] Fitch v. Helvering, 8 Cir., 70 F.2d 583; Waggaman v. Helvering, 64 App.D.C. 371, 78 F.2d 721.

the property of those who have been innocent, because others may conceal their frauds by false transactions similar in form to those which were honestly employed in the instance in question. The Tax Court has not found, and could not have pointed to any evidence in support, if it had found, that any of the transactions were in fact fictitious, or in the least tainted. There was no dispute of fact; the question was only whether the resolutions did in law release the debts. Unless we have power to review such a question, we have no jurisdiction whatever.

Order reversed; deficiency expunged.